UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

JOSEPH SAVOY                                      CIVIL ACTION

VERSUS

DOUGLAS STROUGHTER, ET AL.              NO. 18-00463-BAJ-EWD

**RULING AND ORDER**

Before the Court is Defendants' **Motion for Summary Judgment (Doc. 39)**. The Motion is opposed by Plaintiff. (Doc. 46). Defendants filed a Reply. (Doc. 61). A surreply was filed. (Doc. 89). For the reasons stated below, Defendants' Motion is **GRANTED**.

I. **BACKGROUND**

On April 13, 2018, Joseph Savoy[1], at the time an inmate confined to Dixon Correctional Institute ("DCI"), filed this action against Defendants alleging that Defendants used excessive force against him, in violation of his Eighth Amendment right to be free from cruel and unusual punishment under the United States Constitution. (Doc. 1, p. 7–8). Savoy additionally alleged that the excessive force used was in retaliation against him for filing an Administrative Remedies Procedure ("ARP") at a previous institution. (*Id.* at p. 7). Savoy alleged, in the alternative, negligence under Louisiana state law. LA. CIV. CODE art. 2315.

The parties agree that this action arises from an incident which occurred on

---

[1] Savoy has since passed away from unrelated causes. *See* (Doc. 34-1).

1

July 31, 2017 in the hallway of Compound 2 at DCI. The parties acknowledge that force was used against Savoy following a verbal altercation. The facts surrounding the altercation, however, are all in dispute. Savoy contends that he was intentionally verbally and physically harassed by Defendants, allegedly in retaliation for his participation in a prior lawsuit. *See* (Doc. 46, p. 13–4). Defendants, on the other hand, claim that the force used was a "good faith effort to maintain or restore discipline" following Savoy's allegedly raucous and unruly behavior towards them. (Doc. 39-1, p. 18).

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). A party asserting that a fact cannot be genuinely disputed must support the assertion by citing materials in the record, including "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, [and] interrogatory answers" or that an adverse party cannot produce admissible evidence to support the presence of a genuine dispute. *See* FED. R. CIV. P. 56(c)(1).

"[W]hen a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation marks and footnote omitted). "This burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by

2

only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quotation marks and citations omitted). In determining whether the movant is entitled to summary judgment, the Court "view[s] facts in the light most favorable to the non-movant and draw[s] all reasonable inferences in her favor." *Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997).

## III.  ANALYSIS

### A. Retaliation Claims

A prison official may not retaliate against or harass an inmate for using the proper channels to complain about a guard's misconduct. *Morris v. Powell*, 449 F.3d 682, 684 (5th Cir. 2006) (citing *Woods v. Smith*, 60 F.3d 1161, 1164 (5th Cir. 1995)). To prevail on a claim of retaliation, a plaintiff must establish "(1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for [the] exercise of that right, (3) a retaliatory adverse act, and (4) causation." *Id.* (citing *McDonald v. Steward*, 132 F.3d 225, 231 (5th Cir. 1998)) (internal quotation marks omitted).

Savoy has established a specific constitutional right—filing a federal lawsuit at Louisiana State Penitentiary ("LSP") and testifying against the correctional officers there. (Doc. 46, p. 13). Savoy speculates that Defendants "were [] personally angered by the criminal prosecution of the LSP correctional officers" because one of the officers charged in the LSP litigation was allegedly the father of a correctional officer at DCI. (Doc. 46, at p. 14). However, Defendants assert that Savoy has not demonstrated that force was used on Savoy was because it was their intention to retaliate against him for exercising his constitutional rights. (Doc. 61, at p. 7). On the

3

contrary, Defendants assert that the force used was required to maintain discipline following Savoy's violation of institutional rules. (*Id.*, at p. 8).

Plaintiff provides no evidence that Defendants had actual knowledge of Savoy's prior lawsuit. Savoy alleged that Defendants threatened to beat him "like they did to him at Angola." (Doc. 46, at p. 2; Doc. 29-11, at p. 4). However, this statement only appears in Savoy's ARP and in assertions in pleadings filed before this Court. As was noted, Savoy has since passed away from causes unrelated to the incident. None of the Defendants admit to making such a statement and the video recording of the incident does not include audio. Plaintiff's only witness testimony does not include any reference to Savoy's prior lawsuit. *See* (Doc. 46-10). To the extent that Plaintiff's version of events relies solely on Savoy's testimony, that evidence is inadmissible hearsay.[2]

The Federal Rules of Civil Procedure make it clear that a party asserting that a fact is not true or is genuinely disputed must support the assertion by pointing to specific *materials* in the record. FED. R. CIV. P. 56(c)(1). Courts do not serve as the finders of fact on motions for summary judgment. However, they cannot ignore evidence that is not relevant, reliable, or probative. "Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence." *King v. Caldwell ex rel. Louisiana*, 21 F. Supp. 3d 651, 654 (E.D. La. 2014) (citing *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987)).

---

[2] Plaintiff was not deposed prior to his death, nor did he sign an affidavit or other sworn statement to support the assertions contained in the ARP.

4

Plaintiff relies on two additional items of circumstantial evidence to support the retaliation claim. First, that Russel Sanders, a long-time employee of DCI who shares a surname with John Sanders, one of the officers at LSP who was charged with violating Savoy's rights, was on the same roll call as one of the Defendants. (Doc. 46, at p. 14). Plaintiff alleges that this suggests that Russel Sanders is related to John Sanders. (*Id.*). Second, Plaintiff argues that Defendants did not normally work on the wing where the incident took place, and therefore had no reason to be near Savoy other than to retaliate against him. (*Id.*, at p. 13).

Russel Sanders was not involved in the incident of July 31, 2017. Plaintiff provides no evidence to demonstrate that Russel Sanders is related to John Sanders. Indeed, Russel Sanders's Affidavit reveals that not only does Sanders not have any knowledge of Savoy's prior lawsuit, he is not related to John Sanders nor does he have any personal relationship or has ever met John Sanders. (Doc. 47-3, at p. 8). Further, the fact that Defendants did not usually work on Savoy's wing, without more, cannot support a claim of retaliation.

Without specific facts or evidence that the force used on July 31, 2017 was intended to be in retaliation for Savoy's exercise of his constitutional rights, Plaintiff's retaliation claim fails.

### B. Excessive Force and Qualified Immunity

Savoy alleges that the force used against him was excessive, in violation of 42 U.S.C. § 1983 and the Eighth Amendment. Defendants allege that their actions were not excessive and, even if they were, their conduct is protected by the doctrine of qualified immunity.

5

### i. Legal Standard

#### a. Excessive Force

In the prison context, the Supreme Court has held that the "unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (emphasis added) (internal quotations omitted). The Court has further held that "[a]mong 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.'" *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981).

"Whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992). It is not necessary that a prisoner suffer serious injury. The prisoner must only suffer more than a *de minimis* injury to make out an excessive force violation. *Id.* at 4. In addition to considering the extent of the injury suffered, the Court also considers "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Id.* at 8 (citing *Whitley*, 475 U.S. at 321).

#### b. Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"

6

*Terry v. Hubert*, 609 F.3d 757, 761 (5th Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223 (2009)). A public official is entitled to qualified immunity unless the plaintiff demonstrates that (1) the defendant violated the plaintiff's constitutional rights; and (2) the defendant's actions were objectively unreasonable in light of clearly established law at the time of the violation. *Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011) (citing *Freeman v. Gore*, 483 F.3d 404, 410–11 (5th Cir. 2007)). The Supreme Court has held that courts have the discretion to determine which prong of qualified immunity should be analyzed first. *Pearson*, 555 U.S. at 236. In conducting the qualified immunity analysis, courts usually adopt the plaintiff's version of the facts, unless the plaintiff's version is blatantly contradicted by the record. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

### ii. Analysis

Here, the Court finds it appropriate to assess initially the issue of whether Defendants violated Plaintiff's Eighth Amendment rights. To determine whether the force applied to Savoy was "a good faith effort to maintain discipline" or was applied "maliciously and sadistically to cause harm", the Court is guided by the four, nonexclusive factors outlined in *Hudson*.

### a. Extent of injury suffered

While the "core judicial inquiry" in an Eighth Amendment excessive force allegation is the nature of the force used, "the extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (quoting *Hudson*, 503 U.S. at 7). A "significant injury" is not a threshold requirement

7

for establishing an excessive-force claim. *Wilkins*, 559 U.S. 37–8 (2010); *Hudson*, 503 U.S. at 7. However, "[t]he Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id.* at 37–8 (quoting *Hudson*, 503 U.S. at 9–10).

Savoy had preexisting injuries that necessitated his use of a wheelchair and a sling for his left arm. (Doc. 46, at p. 24). He alleged that, as a result of the force used, he "suffered a re-injury of his left shoulder, which caused multiple pinched nerves, and multiple pinched nerves [sic] in his head and back, as well s [sic], from dizziness and weakness and blurry vision from the head injuries and aggravation of his pre-existing injuries." (Doc. 46, p. 3). Savoy stated that he believed that his injuries were caused by the July 31, 2017 incident in his sick call notes, writing on one occasion "I complaint [sic] about these injuries every time I make sick call." (Doc. 39-10, p. 18).

The record does not support that Savoy suffered from all of the injuries he described. On the day of the altercation, medical personnel noted that Savoy presented a "facial abrasion," but when assessed two hours later there was no evidence of ecchymosis (typically caused by bruising), hematoma, laceration, abrasion, or edema. (Doc. 39-10, p. 20). Savoy was taken for x-rays on August 4, 2017. The x-ray of his upper back was negative for acute findings. (*Id.* at p. 6). The x-ray of his right wrist was negative for bony or joint abnormalities. (*Id.* at p. 7). The x-ray of his chest was negative for any acute processes. (*Id.* at p. 8). The x-ray of his left shoulder was negative for any acute abnormalities, although the shoulder did show

8

"chronic separation." (*Id.* at p. 9). The x-ray of his right shoulder was negative for acute abnormalities but did find degenerative changes in his joints. (*Id.* at p. 10). The x-ray of his lumbar spine found disc space narrowing, but no definite fractures. (*Id.* at p. 11). The x-ray of his skull found no acute skull fracture. (*Id.* at p. 12).

However, in Savoy's medical record, his "initial segregation assessment," completed when he was transferred to administrative segregation, was changed from a "no" indication under "physically disabled" on the day of the incident, (Doc. 39-10, p. 20), to a "yes" on October 13, 2017, a little over two months after the incident. The October segregation assessment notes that Savoy had "limited use of his left arm." (39-10, p. 16). This is sufficient to show that Savoy was injured.

As such, viewing the evidence in the light most favorable to the Plaintiff, while the Court does not find evidence sufficient to support Plaintiff's claims of pinched nerves and blurry vision, there is evidence to support the allegation that Defendant's conduct may have harmed Savoy's shoulder, or inhibited his recovery from the prior injury. The record also contains evidence to support Savoy's assertion that he had a cut on his face following this incident, satisfying the *de minimis* injury requirement.

### b. Need for the application of force

The parties dispute whether force was necessary. Plaintiff alleges that Savoy was sitting quietly when he was attacked because of Defendants' desire to retaliate against him for his prior ARP. (Doc. 46, p. 17). Defendants assert that Savoy is being untruthful about this version of events. (Doc. 39-1, p. 22). While courts usually do not make credibility determinations on motions for summary judgment, the United States Court of Appeals for the Fifth Circuit has held that "well-supported suspicion

9

of mendacity may serve as a legitimate basis for the factfinder's reasonable inferences concerning the ultimate facts at issue." *Thomas v. Great Atlantic and Pacific Tea Co., Inc.*, 233 F.3d 326, 331 (5th Cir. 2000).

Defendants make a credible argument that Savoy was being dishonest about his version of events. Defendants offer the statement of an inmate, Kenneth Mouton, who alleges that Savoy told him that "he set up everything that happen [sic] with Col. Straughter [sic]. He also told [Mouton] that he showed another guy how to do the same thing to get money and he also gave this guy his attorney information." (Doc 39-16, p. 1). Plaintiff does not assert that the statement is false, but merely states that the allegation that Savoy planned this from the beginning is "extraordinary." (Doc. 46, p. 10). Plaintiff offers no evidence to rebut this statement. This, in addition to the fact that—as the Court found above—Plaintiff has offered no evidence to show that Defendants knew Savoy prior to the incident on July 31, 2017 and or knew of his prior ARP claim, strongly calls into question Plaintiff's version of events.

Even if Savoy intended to antagonize the Defendants into using force against him, Defendants still could have used excessive force in subduing him depending on the circumstances. Therefore, regardless of the truth or falsity of the origins of the incident, the Court must analyze whether the force used was excessive.

Courts have found that where an inmate ignores the verbal commands of an officer, force can be used to restore order. *See Preston v. Hicks*, 721 Fed. Appx. 342, 345 (5th Cir. 2018). Defendants assert that force was necessary in this instance to

subdue Savoy because he was being disruptive. (Doc. 39-1, p. 2). This particular use of force incident began with a conversation between Savoy and Defendant Haver Durr. Defendants claim that Durr ordered Savoy to "cease his cursing." (Doc. 39-9 at ¶ 6). Savoy allegedly refused the order and began to threaten Defendant Durr. (Doc. 39-1, p. 2). Stroughter emerged from an office nearby and ordered Savoy to cease threatening Defendant Durr. (*Id.*) Savoy allegedly refused and grabbed Stroughter's hand. (*Id.* at ¶ 8). Savoy also allegedly rose from his wheelchair. (Doc. 39-1, p. 14). From there, Defendants argue it was necessary to use force to subdue Savoy, who continued to resist the officers' attempts to discipline him. (Doc. 39-1, p. 3).

Plaintiff acknowledges that Savoy engaged in an exchange of words with prison staff. (Doc. 46, p. 17). However, Plaintiff argues that Defendants prior to beating Savoy, conspired to do so, and in doing so stated "Less [sic] beat Joseph Savoy like they did him at Angola." (Doc. 39-11, p. 4). The Defendants then allegedly punched him in the face and stomped on his head for no valid reason. (Doc. 46, p. 5).

Again, the only evidence of this statement is Savoy's statement in his ARP which—as previously noted—is inadmissible hearsay. (Doc. 39-11). Plaintiff provides the declaration of Leopold Charles Lacoste, an inmate who was allegedly present during the incident, to support Mr. Savoy's account of the events, but he does not offer comments on this statement. (*See* Doc. 46-10, p. 1).

Following the incident, Savoy allegedly gave a note to another inmate, Paul Felix, and requested that he "write this statement in your hand writing and make a

11

copy of it so I can send it to my attorney."[3] (Doc. 39-15, p. 1). The statement reads in part, "I seen [sic] Lt. Col. Stroughter walk up to offender Savoy and flip offender Savoy out of his wheelchair because offender Savoy was talken [sic] when Lt. Col. Stroughter told offender Savoy to shut up." (Doc. 39-15, p. 1).[4] Plaintiff does not deny that the statement was written by Savoy, but rather argues that it is not known what Felix would have actually written. (Doc. 46, p. 9).

It is clear from this statement that Savoy wanted Felix to write what he had prepared for him. The Court finds it suspicious that the version of events as written in the statement Savoy gave to Felix coincides with Defendant's version of events, rather than with Savoy's version as outlined in his ARP. As the Court discussed previously regarding Plaintiff's retaliation claim, Defendants deny any and all knowledge of the litigation that arose from the incident at LSP. (Doc. 39-6, p. 11; Doc. 39-9 at ¶ 17). Both Defendants assert that they did not know who Savoy was prior to the incident in question. (Doc. 39-9 at ¶ 16; Doc. 39-7 at ¶ 19). There is no evidence in the record, other than the fact that both Defendants work in the jail, to support the allegation that Defendants knew who Savoy was in order to refer to him

---

[3] Mr. Felix sent the letter to an officer at DCI, rather than the Plaintiff's attorney. (Doc. 39-15, p. 3).

[4] Unlike the statements from Plaintiff's ARP, this statement by Plaintiff is offered by Defendants. It is admissible on two grounds: First, it is not offered for the truth of the matter asserted—indeed, Defendants argue that this is not what transpired on the day of the incident. (Doc. 39-1, p. 23). As such, the statement would be admissible at trial as a non-hearsay statement. *See Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.*, 630 F.2d 250, 262 (5th Cir. 1980) ("An out-of-court utterance must have two characteristics before it is rendered inadmissible as hearsay: It must be a "statement"-that is, a verbal assertion, or conduct intended as an assertion. . . and it must be offered to prove the truth of the matter it asserts."). Second, it is a statement by a party opponent. *See* FED. R. EVID. 801(d)(2).

by his full name, that they were aware of the previous litigation, and decided to attack him for that prior incident.

Accordingly, the Court finds that the record does not support Plaintiff's allegation that Defendants attacked Savoy for no reason. Based on the evidence that would be admissible at trial, the evidence reveals that Savoy was being unruly and that he disregarded orders from Defendants to be quiet. However, Savoy was also in a wheelchair. Therefore, a reasonable jury could find that force was not necessary to subdue Savoy in this particular instance and manner, given his physical condition, and a genuine dispute of material fact still exists.

### c. Threat Reasonably Perceived by Officers

When examining an excessive force case, the "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer. While the Court finds that Savoy was likely agitated, there is a dispute as to what he said. Defendants argue that Savoy was not just cursing, but threatening Durr. Stroughter stated that Savoy threatened to kill Durr. (Doc. 46-2, p. 4; Doc. 39-6, p. 7). He also allegedly stated, once restrained, that he was going to "f--- y'all up the way I f---ed Angola people up" and that he was going to cut Durr up "in a million pieces." (Doc 39-8, p. 18). Defendants assert that they did not use force on Savoy until they perceived a threat from Savoy moving his arm, grabbing Stroughter, and standing. (Doc. 39-1, p. 19). Defendants argue that Savoy was consistently resisting efforts to subdue him, and therefore they had to push Savoy's hands down in order to control him. (Doc. 39-1, p. 15).

Plaintiff denies that Savoy threatened Defendants. (Doc. 46, p. 8). The video

13

has no audio, and does not show the initiation of the confrontation. Plaintiff notes that Savoy was in a wheelchair and his arm was in a sling, but does not argue that Savoy could not move his arms or get out of the chair. *Id.* In fact, while Plaintiff argues that Savoy was not resisting, Plaintiff concedes that Savoy "remove[d] Lt. Col. Stroughter's hand" from his upper body.[5] Plaintiff also states that "Mr. Savoy put[] both hands on the arm rest of his wheelchair and shift[ed] his weight to his arms" before being pushed to the ground by Defendants. *Id.* This is consistent with Defendants' testimony that they had to physically control Savoy to get him into restraints due to his resistance. (Doc. 39-1, p. 16).

Defendants argue that this circumstance is similar to the case of *Waddleton v. Rodriguez*, 750 Fed. Appx. 248 (5th Cir. 2018). In *Waddleton* the plaintiff, who was handcuffed and using a cane, used profanity and kicked open a door, and stated that he was "pissed off." *Id.* at 251. Officers were ordered to place plaintiff against a wall. *Id.* While being escorted to the wall, plaintiff "quickly" turned away from the wall and towards the officers, who subsequently placed him on the ground and restrained him. *Id.* The Fifth Circuit found that, because plaintiff "made a threatening movement [and] resisted restraint, [] the amount of force used was not gratuitous," despite the fact that plaintiff was restrained and physically handicapped. *Id.* at 254.

Here, the Court views the facts in a light most favorable to the Plaintiff. The

---

[5] The Court notes that Plaintiff's Memorandum alleges that Lt. Col. Stroughter's hand was removed "from [Plaintiff's] neck." (Doc. 46, p. 19). However, in the preceding sentence, Plaintiff's Memorandum states that "Lt. Col. Stroughter appears to have his hands near or around Mr. Savoy's neck or upper chest." *Id.* In the interest of providing the most accurate account of events, the Court declines to find that Defendant Stroughter's hands were actually on Plaintiff's neck.

14

evidence demonstrates that Savoy was, at a minimum, agitated. There is also evidence in the record, such as the statement by Lacoste, that indicates that Savoy did not threaten Defendants at the time. *See* (Doc. 46-10). However, this same statement indicates that the argument was loud and that Savoy lifted his arm "to deflect Defendant's hand." *Id.* As such, the circumstances are similar to *Waddleton*, and Savoy's movements alone could have reasonably been considered a threat to offers necessitating the use of force from their perspective.

### d. Efforts made to temper the severity of force

Throughout the record, evidence from both parties demonstrates that efforts were made to temper the severity of force used. In the statement Plaintiff provided from LaCoste it is noted that Defendant Stroughter instructed Savoy to "shut up and calm down." (Doc. 46-10, p. 2). Both Defendants assert that they gave Savoy "several" warnings to cease "his recalcitrant behavior." (Doc. 39-1, p. 18). The parties agree that it was not until Savoy moved his arm, whether to defend himself or to attack Defendants, that force was used. (Doc. 39-1, p. 19; Doc. 29-8, p. 17; Doc. 46-10, p. 2). Both parties agree that once Savoy ceased moving, the force ended. (Doc. 39-10, p. 19; Doc. 46, p. 20).

While Plaintiff's response memorandum argues that the force was not necessary, Plaintiff does not address the element of whether the severity of the response was tempered. Based upon the record, it is clear that once the threat, as the officers allegedly perceived it, was subdued the use of force ceased. As such, the Court finds that the uncontested evidence reveals efforts were made to temper the severity of the response.

15

### iii. Conclusion

Based on the nonexclusive *Hudson* factors, the Court finds that Savoy's Eighth Amendment rights were not violated by Defendants. The core *Hudson* inquiry is whether force was used maliciously or to restore discipline. When evaluating the *Hudson* factors, the Court "must keep in mind that prison officials 'may have had to act quickly and decisively." *Baldwin v. Stalder*, 137 F.3d 836, 840 (5th Cir. 1998). "Accordingly, they are entitled to wide-ranging deference." *Id.*

Viewing the admissible evidence and facts in the light most favorable to Plaintiff, the evidence supports Plaintiff's claim that Savoy was injured by Defendants. However, the record does not support Plaintiff's assertion that Savoy was sitting calmly and was attacked for no reason. The force used by Defendants was proportional to the threat reasonably perceived by the officers, based on Savoy's disruptive behavior. Defendants also made efforts to temper the use of force.

Because the Court finds that Savoy's constitutional rights were not violated, it declines to determine whether the Defendants' actions were objectively unreasonable in light of clearly established law at the time of the violation. The Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims.

## IV. Conclusion

In sum, Plaintiff has failed to offer any evidence to show that Defendants retaliated against Savoy for his grievances filed against officers at LSP, nor did they violate his Eighth Amendment rights.

Accordingly,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. 39)

is GRANTED as to Plaintiff's § 1983 claims, and the federal claims by Plaintiff against Defendant are hereby **DISMISSED** with prejudice.

**IT IS FURTHER ORDERED** that, because the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims, Plaintiff's remaining state law claims are **DISMISSED WITHOUT PREJUDICE**, subject to refiling in state court.

A separate judgment shall issue.

Baton Rouge, Louisiana, this 25th day of March, 2021

_____
**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**